Filed 1/8/24  P. v. Perez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B324095 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA113936) |
| v. | |
| ERIK ARMENTA PEREZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Maxine Weksler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Charles S. Lee and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

Erik Perez appeals from an order denying his petition for resentencing under Penal Code[1] section 1172.6,[2] which limits accomplice liability for murder. Erik[3] concedes he was not convicted under a now-invalid theory of felony murder or the natural and probable consequences doctrine. Instead, he contends he was convicted based on a theory under which malice was improperly imputed to him. We disagree and affirm the order.

## BACKGROUND

### I. The underlying crime

Our summary of the evidence underlying the murder is from the opinion affirming Erik's and Omar's judgment of conviction, *People v. Perez* (Jan. 28, 2021, B296242) [nonpub. opn].

"1. *Background information*

"Appellant Omar is appellant Erik's uncle, and is three years older than Erik. Approximately a month and a half before the charged murder, Erik moved to California from Arizona and began staying in Omar's home. Prior to that time, the men had met only twice.

"The victim, Alberto Calvillo, and Karen Salinas were engaged to be married and had two young children together.

---

[1] All further undesignated statutory references are to the Penal Code.

[2] Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

[3] Because Erik Perez and Omar Perez share a surname, we refer to them by their first names to avoid confusion.

"2. *People's evidence*

"a. *The murder*

"On the evening of November 6, 2016, Calvillo and Salinas, accompanied by Salinas's cousin Ernesto and her friend Lizeth, went to the Mariscos Uruapan restaurant in Baldwin Park (hereinafter 'Mariscos'). In addition to serving food, Mariscos offered live music. Mariscos was equipped with a video surveillance system, with cameras both inside and outside of the restaurant.

"Erik and Omar also patronized Mariscos that evening, and sat at a table near Calvillo's group. Juan Serrano, another restaurant patron, spent approximately a half hour drinking, dancing, and eating at [Erik's and Omar's] table after his original dining companions left for the evening. He had not met ... appellant previously. Erik and Omar had no confrontation or issue with Calvillo while inside the restaurant.

"Shortly before 11:00 p.m., Salinas began feeling unwell. She and Calvillo stepped outside so she could get some fresh air. In front of the restaurant's entrance was a small, tiled area. A ramp led down from the entrance to the parking lot. Perpendicular to the ramp, some stairs led out to Ramona Boulevard. Calvillo and Salinas stood on the stairs, with Calvillo a step from the top.

"As Calvillo and Salinas talked on the stairs, Erik, Omar, and Serrano came outside and stood near them at the top of the ramp. Omar loudly made derogatory remarks about women, including that all women were 'gold diggers' and 'whores' who only wanted money. He appeared angry and agitated. Calvillo told the men several times, 'Shut up. You guys are drunk.' Someone from Omar's group said that they were not talking

about Salinas. But, one of the men then pointed at Salinas, and one of them said, 'Well, look at your girl. Look at what she's wearing.' Omar said to Erik several times, 'Go get the 9.' Erik left the group and went to the parking lot.

"Calvillo stepped up to the top of the ramp where Omar and Serrano were, approximately three feet away from them. Serrano tried to calm Omar down. Salinas stepped in front of Calvillo and tried to convince him to go inside. He refused, saying he was not going to fight and was not going to start anything, but was not going to 'go inside and look like a bitch,' either. He told Salinas to go back in the restaurant and get her cousin Ernesto. She did.

"Meanwhile, Erik walked through the parking lot, entered a Toyota Camry, and drove it to the driveway in front of the restaurant. He left the engine running, and remained in the car. When the Camry pulled up, Omar ran down the ramp to the car. Erik opened the door and handed Omar a gun. Omar then ran back up the ramp to the front of the restaurant, shot Calvillo multiple times, ran back down the ramp to the Camry, and entered the front passenger seat. Erik drove them from the scene.

"Salinas heard screaming and went back outside, where she found Calvillo on the ground, having difficulty breathing. Her friend Lizeth attempted to put pressure on Calvillo's gunshot wounds, while Salinas held Calvillo's hands. Calvillo was transported to a hospital, but did not survive.

"The entire incident, from when appellants came outside until the shooting, lasted just over three minutes.

4

"b. *The investigation*

"Police officers stopped the Camry within 15 minutes of the murder.  In a field show-up, Salinas identified both appellants, who were arrested.

"Police found 9 nine-millimeter Aguila casings at the scene.  Three additional nine-millimeter casings were found in the Camry.[4]  A Browning Arms, high-powered, nine-millimeter semiautomatic handgun was found hidden in the center console beneath the gearshift.  A firearms examiner opined that the gun in the Camry discharged all the casings found at the murder scene and inside the car, as well as three bullet fragments recovered from Calvillo's body.  Gunshot residue was found on [Erik's and Omar's] hands.  Erik's DNA was found on the gun's grip, as well as on the three casings found in the Camry.

"After [Erik's and Omar's] arrests, Erik was seated in a police car for 10 to 15 minutes.  On the floor in front of Erik's seat, officers found four small baggies containing methamphetamine.  A detective opined that the methamphetamine was possessed for the purpose of sale, but acknowledged that 'users also sell.'  Omar had in his possession two baggies containing cocaine.

"Calvillo suffered five gunshot wounds to his shoulder, left chest, abdomen, and right leg.  The shoulder and chest wounds were fatal.  His toxicology report tested negative for alcohol but positive for methamphetamine and its metabolite.

---

**4**     Erik testified that earlier on the day of the shooting, Omar had fired the gun several times while in the Camry.  The casings found in the car were a result of that shooting.

"3. *Defense evidence*

"a. *Erik's testimony*

"Erik testified in his own behalf, as follows. On the day of the shooting, at 3:00 p.m., he and Omar consumed approximately a half bottle of tequila while at home. At about 4:00 p.m., they went to Ramada, a 'dance place' in Baldwin Park, to drink and celebrate the impending birth of his child. Erik drove them there. At Ramada, the men drank beer and used 'a lot' of cocaine in the restroom; they also ingested methamphetamine. They met two women, Guadalupe M. and her friend, whom they had never met before. The women declined their requests to dance because the music was not good. The men suggested the women accompany them to a different restaurant, but they refused and said they were going to Mariscos. When the women left, Erik and Omar also went to Mariscos.

"At Mariscos, Guadalupe and her friend sat at Omar and Erik's table. Erik flirted and danced with Guadalupe, while Omar directed his attentions to the friend. Erik and Omar bought the women drinks, and Omar bought them flowers. At some point thereafter, the women left the restaurant. Erik walked with them to their car, unsuccessfully trying to persuade them to stay.

"While at Mariscos, Omar and Erik ordered several buckets of beer. Omar ingested cocaine at the table. Erik also used cocaine, but in the restroom. The men also used methamphetamine. They had no 'problems' with anyone while inside the restaurant.

"Around 11:00 p.m., Omar, Erik, and Serrano walked outside and stood at the top of the ramp, near Calvillo and Salinas. Omar was upset that Guadalupe and her friend had left.

6

Referring to the women, Omar loudly talked about women being 'completely worthless' and only caring about money. Calvillo got upset because he believed Omar was talking about Salinas. He began arguing with Omar. Omar apologized and stated he was not referring to Salinas. Calvillo, who was a big man and looked angry, stepped toward them, stood over Erik, and threatened to 'beat the fuckin' shit out of' them. Erik thought Calvillo wanted to hit them and fight, and was afraid. Salinas tried to separate Calvillo from the men and convince him to go inside, but he refused. Calvillo told Salinas to go get her cousin. Omar told Erik to 'go get the 9,' which Erik understood to mean Omar's nine-millimeter firearm that was hidden inside the Camry's center console. Omar did not say that he intended to kill Calvillo.

"Erik went to get the gun. He walked to the Camry in the parking lot, during which time he could hear Omar and Calvillo arguing loudly. He sat inside the Camry for approximately a half minute, retrieving the gun. He then executed a three-point turn in order to get to the front of the restaurant and drove to the driveway area near the bottom of the ramp. When Omar ran down to the car, Erik handed him the gun and remained inside. He heard multiple gunshots. Omar returned to the car, and Erik drove them away from the scene.

"Erik explained he retrieved the gun because he was afraid Calvillo was going to 'do something' to him and Omar, and 'because of the drugs.' He did not know or intend that Omar would kill Calvillo.

"b. *Expert testimony*

"Dr. John Budny, an expert in the fields of toxicology, pharmacology and biochemistry, testified regarding the effects of drugs and alcohol on the human body. Alcohol, cocaine, and

methamphetamine affect cognitive and psychomotor functions. Alcohol lessens a person's 'control mechanisms,' and methamphetamine can cause aggression and paranoia. All three substances affect a person's ability to reason and reflect on their actions. Persons under the influence of alcohol, methamphetamine, and cocaine would have 'grossly impaired' cognitive functions and would be impulsive, unable to think through their actions, and unable to carefully consider prior to making a decision. The effect of such substances on any individual user depends on numerous variables, including the person's metabolism, how much they have eaten, and their tolerance for the substance. A person could be cognitively impaired yet still be able to drive a car. Budny could not definitively opine as to appellants' level of impairment or how the drug and alcohol use affected them. However, based on the amounts of alcohol appellants reported consuming, they would have been under the influence for purposes of California's driving laws.

"Calvillo's autopsy report indicated he had levels of methamphetamine in his blood that could cause behavioral changes such as agitation and restlessness."

II. Erik's conviction and sentence

At Erik and Omar's joint trial, the People's theory of the case was that Omar was the actual killer and Erik was the direct aider and abettor. In accordance with that theory, a jury convicted Erik and Omar of willful, deliberate, and premeditated first degree murder (§ 187, subd. (a)), with a true finding that Omar personally and intentionally discharged a firearm, proximately causing great bodily injury and death (§§ 12022.53, subds. (b), (c), (d), 12022.5, subd. (a)(1)). As to Erik, it found a

8

principal-armed allegation true. (§ 12022, subd. (a)(1).) The trial court sentenced Erik to 25 years to life in prison.

III.     Postconviction proceedings

In 2021, Erik filed a form petition for resentencing under section 1172.6. Private counsel represented Erik on the petition. The People opposed the petition on the ground Erik was not convicted based on felony murder or the natural and probable consequences doctrine but was instead convicted on a direct aiding and abetting theory. In response, Erik contended he was convicted under a theory by which malice was imputed to him based solely on his participation in the crime. The trial court denied the petition, finding that Erik was necessarily convicted of murder under a direct aiding and abetting theory.

## DISCUSSION

I.      Overview of Senate Bill No. 1437

To the end of ensuring a person's sentence is commensurate with the person's individual criminal culpability, Senate Bill No. 1437 (2017–2018 Reg. Sess.) limited accomplice liability under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in a crime. (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 986; *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843.) Senate Bill No. 1437 added section 189, subdivision (e) (limiting application of the felony-murder rule) and section 188, subdivision (a)(3) (stating that "to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed

9

to a person based solely on his or her participation in a crime."). As amended by Senate Bill No. 775, effective January 1, 2022, these ameliorative changes to the law now expressly apply to attempted murder and voluntary manslaughter.

Senate Bill No. 1437 also created a procedure, codified at section 1172.6, for a person convicted of murder, attempted murder, or voluntary manslaughter under the former law to be resentenced if the person could no longer be convicted of those crimes under the current law.  (*People v. Lewis*, *supra*, 11 Cal.5th at p. 959; *People v. Gentile*, *supra*, 10 Cal.5th at p. 847.)  A defendant commences that procedure by filing a petition containing a declaration that, among other things, the defendant could not presently be convicted of murder, attempted murder, or voluntary manslaughter under the current law.  (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).)

At the prima facie stage, the trial court takes as true the petitioner's factual allegations and assesses whether the petitioner would be entitled to relief if those allegations were proved.  (*People v. Lewis*, *supra*, 11 Cal.5th at p. 971.)  In determining whether the petitioner has made a prima facie case for relief, the trial court may look at the record of conviction, including jury instructions, verdicts and closing argument, to determine readily ascertainable facts such as the crime of conviction.  (*People v. Duchine* (2021) 60 Cal.App.5th 798, 815; see, e.g., *People v. Harden* (2022) 81 Cal.App.5th 45, 56.)  At the prima facie stage, the trial court does not engage in fact finding that involves the weighing of evidence or exercise of discretion.  (*Lewis*, at p. 972.)  If a petition establishes a prima facie case for relief, the trial court must appoint counsel if requested, issue an

10

order to show cause, and hold an evidentiary hearing. (§ 1172.6, subds. (b)(3), (c), & (d)(1).)

II. Erik was not convicted of murder under an invalid theory

Erik contends he established a prima facie case for relief because the jury instructions on aiding and abetting and the trial court's responses to jury questions allowed the jury to impute malice to him based solely on his participation in the crime. We disagree.

A. *Governing principles and jury instructions*

Murder is the unlawful killing of a human with malice aforethought. (§ 187, subd. (a).) Malice is express "when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) First degree murder occurs when the murder is willful, premeditated, and deliberate. (§ 189, subd. (a).)

A defendant is liable as a direct aider and abettor of express malice murder if the defendant aided or encouraged the murder with knowledge of the perpetrator's unlawful purpose and with the intent or purpose of committing, encouraging, or facilitating the murder's commission. (*In re Lopez* (2023) 14 Cal.5th 562, 579; *People v. McCoy* (2001) 25 Cal.4th 1111, 1122 [direct aiding and abetting is based on participants' combined actus reus and aider and abettor's own mens rea].) When an aider or abettor, acting with a personal mens rea of premeditation and deliberation, knowingly and intentionally

11

assists another to kill someone, the aider and abettor is guilty of first degree premeditated murder.  (*In re Lopez*, at p. 579.)

In contrast, a defendant is liable as a direct aider and abettor of implied malice murder if the defendant, by words or conduct, aids the commission of a life-endangering act, not the act's result.  (*People v. Reyes, supra,* 14 Cal.5th at p. 991.)  The direct aider and abettor must know that the perpetrator intended to commit the act, intend to aid the perpetrator in committing the act, know that the act is dangerous to human life, and act in conscious disregard to human life.  (*Ibid.*)

In accordance with these principles, the trial court here instructed Erik's jury on murder with CALCRIM No. 520:  "To prove that a defendant is guilty of this crime [murder], the People must prove that: [¶] 1.  The defendant committed an act that caused the death of another person; [¶] AND  [¶]  2. When the defendant acted, he had a state of mind called malice aforethought."  The instruction then stated that there are two kinds of malice:  express and implied, either of which is sufficient to establish the state of mind for murder.  The defendant had express malice "if he unlawfully intended to kill" and implied malice if he "intentionally committed an act"; the "natural and probable consequences of the act were dangerous to human life"; at "the time he acted, he knew his act was dangerous to human life"; and he "deliberately acted with conscious disregard for human life."

The trial court also instructed the jury on willful, deliberate, and premeditated murder with CALCRIM No. 521:  "A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation.  The defendant acted *willfully* if he intended to

12

kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice, and knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death."

Finally, the trial court instructed the jury with the standard direct aiding and abetting instruction, CALCRIM No. 401: "To prove that defendant Eri[k] Perez is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

B. *The instructions did not permit the jury to impute malice to Erik*

Erik concedes that his jury was not instructed on felony murder or the natural and probable consequences doctrine. However, citing *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*), he argues that the instructions, CALCRIM No. 401 in particular, nonetheless allowed the jury to impute malice to him based on his participation in the crime.

In *Langi, supra*, 73 Cal.App.5th 972, Langi and three other men beat the victim, who died from head trauma after falling and hitting his head during the assault. Langi's jury was instructed

on aiding and abetting with CALJIC No. 3.01 (which is substantially similar to CALCRIM No. 401) and on second degree murder with CALJIC No. 8.31. The jury found Langi guilty of second degree murder, and the trial court summarily denied his subsequent section 1172.6 petition. On appeal, the appellate court found that Langi was entitled to an evidentiary hearing because the instructions permitted him to be found guilty of aiding and abetting second degree murder by improperly imputing malice to him and without finding he personally acted with malice.

The court explained that although the aiding and abetting instruction stated that a person aids and abets a crime if the person acts with knowledge of the perpetrator's unlawful purpose and with the intent or purpose to commit or encourage that crime, "the second-degree-murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent of causing death." (*Langi*, *supra*, 73 Cal.App.5th at p. 982.) That is, "while the perpetrator must have deliberately performed the fatal act 'with knowledge of the danger to, and with conscious disregard for, human life' (CALJIC No. 8.31), his purpose may have been only to strike or to injure, or conceivably only to embarrass, the victim. Since the perpetrator's purpose need not have been to kill the victim, the aider and abettor's knowledge of that purpose similarly need not have been knowledge that the perpetrator aimed to kill. If the perpetrator need not have had 'murderous intent,' certainly the aider and abettor need not have had such an intent." (*Id.* at pp. 982–983.) The instructions given permitted the jury to conclude that, to be guilty as an aider and abettor of second degree murder, Langi need only have intended to encourage the perpetrator's

14

intentional act—punching the victim—whether or not Langi intended to aid or encourage the victim's killing, and whether or not Langi personally knew of and disregarded the risk of such a killing. (*Id.* at p. 983.) In short, the instructions permitted the jury to find that the aider and abettor intended to help the perpetrator commit an act—an assault, for example—without the mental state of conscious disregard for human life. *Langi* concluded that the instructions should have been tailored to state that, to be guilty as a direct aider and abettor of second degree murder, an accomplice must have acted with the mental state of implied malice. (*Ibid.*; accord, *People v. Powell* (2021) 63 Cal.App.5th 689.)

*Langi* is distinguishable. *Langi* concerned a second degree murder conviction, which can be accomplished with implied malice. In contrast, Erik's jury found him guilty of first degree premeditated murder, which can only be accomplished with express malice. Erik's jury was instructed regarding premeditation and deliberation. By finding Erik guilty of first degree premeditated murder, the jury necessarily concluded he harbored express malice *and* the elevated mens rea of premeditation and deliberation, both of which require intent to kill. (See also *People v. Coley* (2022) 77 Cal.App.5th 539, 547 [attempted murder conviction necessarily required intent to kill finding]; cf. *People v. Maldonado* (2023) 87 Cal.App.5th 1257, 1259, 1262–1263 [jury instructions permitted conviction based on imputed malice when defendant was convicted of first degree lying-in-wait murder, which does not require intent to kill].)

We also find unpersuasive Erik's argument that the jury might have been confused about CALCRIM No. 401's reference to aiding and abetting "the crime." He suggests that the jury could

15

have thought that "the crime" referred to something other than murder, such as assault with a firearm. Unlike the *Langi* defendant who was charged with robbery, battery, and murder, Erik was charged only with having committed murder. His jury could not have misunderstood that the reference to "the crime" in CALCRIM No. 401 was to murder.

C.     *The jury questions do not show that the jury imputed malice to Erik*

Although the jury instructions did not allow the jury to convict Erik by imputing malice to him, he argues that two questions the jury asked during deliberations show it did just that.[5]

The jury first asked, "Is Erik guilty of Murder 2 now?" In response, the trial court reminded the jury that defendants were presumed to be not guilty, so whether Erik was "guilty of murder two now," my "simple response is … only unless the jury finds otherwise beyond a reasonable doubt. And until or unless a unanimous decision is made by that jury as to Eri[k] in the crime of murder, he is presumed to be not guilty."

Second, the jury asked, "Is there a[n] option of Murder 2 besides 1st degree & voluntary manslaughter?" The trial court responded, "Well, I don't mean to be insulting by answering the question this way but there is an option and the option is not guilty. [¶] . . . The simple answer is yes, and it's not guilty if the jury finds that the evidence of the trial leaves you with a

---

[5]     The jury asked a third question, "What is imperfect manslaughter?" The trial court said that there was a crime of voluntary manslaughter but no crime of imperfect manslaughter, and it reiterated the elements of imperfect self-defense.

reasonable doubt as to whether either one or both defendants are guilty of murder, first-degree, second-degree, or voluntary manslaughter. So there is an option and it would be not guilty."

Erik analogizes these questions and responses to those in *People v. Nero* (2010) 181 Cal.App.4th 504. The *Nero* jury expressly asked if it could find the aider and abettor guilty of a lesser crime and if an aider and abettor could " 'bear less responsibility.' " (*Id.* at p. 519.) The trial court, however, said only that the aider and abettor could be found not guilty. *Nero* observed, "But the jury's expressed concern was not whether it could acquit the aider and abettor, but whether the aider and abettor had to be found guilty of 'the same level, murder two or manslaughter, or could they be at a lower level?' " (*Ibid.*) In response the trial court repeatedly read CALJIC No. 3.00, which states principals are equally guilty. Based on those circumstances, *Nero*, at page 520, found there was a reasonable possibility the trial court's response to the questions foreclosed the jury from considering whether to find the aider and abettor guilty of a lesser crime.

Similarly, the jury in *People v. Loza* (2012) 207 Cal.App.4th 332, 349, asked whether an aider and abettor's state of mind "need/should be considered" and whether it made "a difference when considering the degrees of murder" that a person aids and abets out of worry of an attack from the perpetrator. The trial court simply told the jury to apply the evidence to the law as instructed. (*Ibid.*)

The jury questions and trial court responses in *Nero* and *Loza* are distinguishable. In those cases, the juries were clearly asking about the aider and abettor's mens rea and the trial courts' responses were inadequate. Here, we do not agree with

17

Erik that implicit in the jury's questions was a belief he was not as culpable as Omar, and therefore the trial court should have explained he could be found guilty of a lesser crime than Omar. It is unclear what the jury meant by the first question. Indeed, it seems to reflect a basic misunderstanding of the jury's role, which is why the trial court appropriately responded that Erik was presumed to be not guilty unless the jury unanimously agreed he was guilty of murder. And unlike the questions in *Nero* and *Loza*, the jury's second question makes clear that the jury understood it could convict Erik of something less than first degree murder. The trial court therefore appropriately told the jury its options were first degree murder, second degree murder, voluntary manslaughter, or not guilty. We therefore do not agree that the trial court's responses to these questions foreclosed the jury from finding Erik guilty of something other than first degree murder or from considering his own mens rea or show that the jury imputed malice to Erik.

III.    The trial court did not improperly engage in fact finding

Erik next asserts that the trial court improperly engaged in fact finding at the prima facie stage by *failing* to consider the jury's questions as evidence the jury imputed malice to Erik. It is unclear how the failure to consider those questions can amount to fact finding. In any event, we have rejected the argument that those questions show that the jury imputed malice to Erik.

IV.    Sufficiency of the evidence

Erik contends that even if he is ineligible for resentencing, his murder conviction still must be reversed, because there was insufficient evidence he had express or implied malice. As we

18

explain, this contention, which we previously rejected on direct appeal, is not properly before us.

Erik cites *Strong*, *supra*, 13 Cal.5th 698, to support his argument we may consider the sufficiency of the evidence to support the murder conviction. *Strong* considered the relationship between a section 1172.6 petition and *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522, cases which clarified and limited the concept of a major participant in an underlying felony who acts with reckless indifference to human life. *Strong* held that a pre-*Banks* and *Clark* finding that a defendant was a major participant who acted with reckless indifference to human life does not preclude a defendant from making a prima facie showing of eligibility for section 1172.6 relief. In so holding, the court noted that a determination substantial evidence supported a murder conviction "is not a basis for denying resentencing after an evidentiary hearing" or for "denying a petitioner the opportunity to have an evidentiary hearing in the first place." (*Strong*, at p. 720.) By this, the court was merely saying that sufficiency of the evidence generally to support a murder conviction is not the issue on a petition for resentencing. *Strong* did not say or hold that a defendant generally may relitigate sufficiency of the evidence issues via a section 1172.6 petition.

Instead, courts have consistently found that section 1172.6 is not a vehicle to relitigate trial errors or issues already decided. (See, e.g., *People v. Coley*, *supra*, 77 Cal.App.5th at p. 549 [§ 1172.6 "is not a means by which a defendant can relitigate issues already decided"]; *People v. Farfan* (2021) 71 Cal.App.5th 942, 947 ["mere filing" of § 1172.6 petition doesn't afford petitioner new opportunity to raise trial error claims or attack sufficiency of

19

evidence to support jury's findings]; *People v. DeHuff* (2021) 63 Cal.App.5th 428, 438 [§ 1172.6 is not a direct appeal].) We rejected Erik's sufficiency of the evidence challenge on direct appeal. (*People v. Perez*, *supra*, B296242.) We have no occasion to reconsider that issue here.

## DISPOSITION

The order denying Erik Perez's Penal Code section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

ADAMS, J.

20